UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| LUPIENT CHEVROLET, INC. d/b/a Lupient Chevrolet,<br><br>          Plaintiff,<br><br>vs.<br><br>GENERAL MOTORS, LLC,<br><br>          Defendant. | Civil Action No. _____<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff, Lupient Chevrolet, Inc., d/b/a Lupient Chevrolet ("Lupient") by way of Complaint against the Defendant, General Motors, LLC ("GM"), hereby alleges as follows:

### Parties

1. Plaintiff Lupient[1] is a corporation organized and existing under the laws of Minnesota with its principal place of business in Bloomington, Minnesota.

2. Lupient is a new motor vehicle dealer as defined by Minn. Stat. § 80E.03(3), and operates a Chevrolet franchised motor vehicle dealership, where it sells and services GM products pursuant to a franchise, as defined by Minn. Stat. § 80E.03(8). Lupient's Franchise Agreement is attached as Exhibit A.

3. Defendant GM is a limited liability company organized and existing under the laws of Delaware with its principal place of business located in Detroit, Michigan. All of the underlying LLC members are domiciled outside of the state of Minnesota.

---

[1] Plaintiff recently changed its legal name from Harold Chevrolet, Inc. to Lupient Chevrolet, Inc., notified Defendant of such change and requested that its name be changed on its Dealer Agreement accordingly.

4. GM is a manufacturer and distributor, as defined by Minn. Stat. §§ 80E.03(4)-(5), as it manufactures *inter alia* Chevrolet vehicles and sells, and offers to sell, those vehicles to new motor vehicle dealers (including Lupient) in this State.

## Jurisdiction

5. This court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that there is complete diversity of citizenship and the amount in controversy exceeds the sum of $75,000 exclusive of jurisdiction and costs.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391 in that jurisdiction is founded solely on the basis of diversity, and GM, by virtue of its systematic and continuous business contacts in this district, resides in this district.

## Facts Applicable to All Claims

### Lupient's Warranty Service Obligations

7. Lupient is obligated, pursuant to its franchise agreement, to provide warranty service on the vehicles it is authorized to sell regardless of whether those vehicles were purchased from Lupient. See Exhibit A, Section 5.2.1. ("Dealer agrees to maximize customer satisfaction by providing courteous, convenient, prompt, efficient and quality service to owners of Motor Vehicles, regardless of from whom the Vehicles were purchased.").[2] Likewise, "[d]ealer agrees to perform (i) required warranty repairs on each qualified Motor Vehicle at the time of pre-delivery service and when requested by

---

[2] Motor Vehicles is defined in the "glossary" of the franchise agreement as the "current model types or series of new motor vehicles specified in any Motor Vehicle Addendum incorporated into this Agreement". Lupient's Motor Vehicle Addendum specifies only Chevrolet vehicles. Thus, for purposes of the franchise, Motor Vehicles is defined as Chevrolet vehicles.

2

owner, and (ii) special policy repairs approved by General Motors." Exhibit A, Section 7.1.2.

8. In performing those "warranty repairs", Lupient is required to use authorized GM parts. See Exhibit A, Section 7.2.1. ("Dealer agrees to use only genuine GM or General Motors approved Parts and Accessories in performing warranty repairs, special policy repairs, and any other repairs paid for by General Motors".) Accordingly, Lupient must also "stock sufficient Parts and Accessories made available by General Motors to perform warranty repairs and policy adjustments and meet customer demand." *Id.* at Section 6.4.2.

9. To summarize, Lupient is required to provide warranty service to any customer that requests it on a GM vehicle that Lupient is authorized to sell (Chevrolet), regardless of whether the vehicle was purchased from Lupient. Likewise, Lupient must stock sufficient GM parts to perform warranty service and is required to use only GM parts in the warranty service it performs.

<u>Lupient's Provision of Nonwarranty Service and the Use of GM Parts</u>

10. In addition to warranty service, Lupient also performs nonwarranty service work. This type of work includes service on Chevrolet vehicles that are no longer under warranty as well as service performed on vehicles other than what Lupient is authorized to sell. Thus, if a customer comes to Lupient with an issue on a Buick or GMC vehicle that is no longer under warranty, Lupient may perform the service, but it is not required to by the terms of the Dealer Agreement. Likewise, the same goes for any other linemake

3

of vehicle (such as Ford, Chrysler, Honda, etc.) that is presented at Lupient's dealership for service.

11. Lupient is not required by the franchise agreement to use GM parts for nonwarranty repairs, but Lupient is required to notify the customer that has a GM vehicle in the event it "installs any equipment, accessory, recycled part or part not supplied by General Motors". Exhibit A, Section 5.1.1. Following up on that requirement, Section 7.2.2 of the franchise agreement requires that "[i]n servicing vehicles marketed by General Motors, Dealer agrees to disclose the use of recycled and non-General Motors parts and accessories as set forth in Article 5.1.1." Thus, the franchise agreement expresses a preference for the use of GM parts on GM vehicles in non-warranty repairs, but there is no requirement of such. Likewise, there is no requirement to use GM parts on non-GM vehicles, or even a stated preference for doing so.

Minnesota's Retail Reimbursement Requirements

12. Minnesota Statute Chapter 80E is entitled "Motor Vehicle Sale and Distribution" and governs the relationship between manufacturers/distributors and dealers. The Chapter governs a wide variety of behavior including the manufacturer's requirements to reimburse dealers for warranty service and parts required of the dealer by the manufacturer. Minn. Stat. § 80E.04(1).

13. State statutes governing the relationship between manufacturers and dealers are not a new creation. Minnesota's statutory scheme was enacted in 1981. In fact, the Supreme Court has described such provisions as necessary due to the "disparity in bargaining power between automobile manufacturers and their dealers". *New Motor*

4

10570295v1

*Vehicle Bd. v. Orrin W. Fox Co.*, 439 U.S. 96, 100 (1978). Statutes, such as Minnesota's, are designed "to protect retail car dealers from perceived abusive and oppressive acts by the manufacturers". *Id.*

14. Section 80E.04(1) provides that "[t]he manufacturer shall also compensate the new motor vehicle dealer for warranty service and parts required of the dealer by the manufacturer". Subdivision two of the Section sets forth how that compensation is determined. Specifically, "[t]he hourly labor rate paid to and the reimbursement for parts purchased by a dealer for warranty services shall not be less than the rate charged by the dealer for like service to nonwarranty customers for nonwarranty service and repairs." Minn. Stat. § 80E.04(2). Therefore, the manufacturer must reimburse its dealers for warranty service and parts required of the dealer by the manufacturer at no less than the dealer's retail rate for like services.

15. The warranty reimbursement legislation "ensures that manufacturers pay market price when they would otherwise be sheltered from the market because of 'the disparity in bargaining power between automobile manufacturers and their dealers.'" *Acadia Motors, Inc. v. Ford Motor Co.*, 844 F.Supp. 819, 824 (D. Me. 1994) *quoting New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 439 U.S. 96, 100 (1978). "The manufacturers have demanded preferential pricing of warranty repairs as a sort of volume discount." *Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 33 (1st Cir.2005). Accordingly, "[t]he statute thus protects the franchised dealer from being required to accept lower profits on repairs it is required to provide to warranty customers than it receives on repairs for retail customers for whom it provides exactly the same services."

10570295v1

*G/C Volkswagen Corp. v. Volkswagen of America, Inc.*, No. 97 CIV. 8364(JGK), 1998 WL 799174 at *4 (S.D.N.Y. Nov. 16, 1998).[3]

16. The requirement that the dealer's retail rate be based on "like service" relates back to the warranty service that is required of the dealer. As set forth above, the only warranty service GM requires of Lupient is for Chevrolet vehicles under warranty, which is to be provided using only GM parts. And, the reimbursement is "for parts purchased by a dealer for warranty services". Thus, the "like service" component of the statute restricts the retail determination to items that are warranty-like and cannot include non-GM parts or other makes that Lupient is not required to service since those are expressly excluded from warranty pursuant to the plain terms of the franchise agreement and consequently, are not "required of the dealer by the manufacturer."

17. Section 80E.13(h) also makes it unlawful and an unfair practice for a manufacturer to "unfairly discriminate among its new motor vehicle dealers with respect to warranty reimbursement".

18. Section 80E.17 provides a right of action for any dealer that is harmed, or would be harmed, by a manufacturer's violation of the Minnesota dealer franchise act. ("Notwithstanding the terms of any franchise agreement or waiver to the contrary, any person whose business or property is injured by a violation of Sections 80E.01 to 80E.17,

---

[3] Indeed, even the United States Congress has recognized the disparity in bargaining power that goes unchecked absent the statutory provisions. "As a result of the imbalance in bargaining power inherent in this relationship, manufacturers possess unparalleled leverage over dealers and potential franchises." S.Rep. No. 107-266 (2002), as reprinted in 2002 WL 32972956. Consequently, "[i]n recognition of the disparity in bargaining power between motor vehicle dealers and manufacturers, all States have enacted laws specifically designed to level the playing field between manufacturers and dealers and prevent unfair contract terms and practices." *Id.* "Manufacturers also exercise considerable control over the flow of revenue to dealers, such as warranty payments." *Id.*

10570295v1

or any person injured because of the refusal to accede to a proposal for an arrangement which, if consummated, would be in violation of Sections 80E.01 to 80E.17, may bring a civil action to enjoin further violations and to recover the actual damages sustained, together with costs and disbursements, including reasonable attorney's fees.")

### Lupient's Request for Retail Parts Reimbursement Pursuant to Minnesota Law and GM's Unlawful Denial

19. Lupient requested retail reimbursement for warranty parts pursuant to Section 80E.04 at a reimbursement rate of 98.84% through a letter to GM dated April 5, 2013. Lupient's Request is attached as Exhibit B. In conjunction with its request, Lupient also submitted to GM the underlying information/documentation utilized in the calculation of its retail rate. These documents include the reports, repair orders relied upon, and analytical documentation, all of which supports Lupient's requested retail reimbursement rate. Lupient's request was based upon the clear requirements of Section 80E.04 and included only Chevrolet vehicles (those Lupient is required to service) and GM parts.

20. GM responded to Lupient's request through a letter dated May 21, 2013, and rejected Lupient's request of warranty parts reimbursement at 98.54%. GM's Response is attached as Exhibit C. GM stated that it rejected Lupient's statutory request and instead, approved Lupient's warranty parts reimbursement at a significantly reduced rate of 80.0%. GM contended that "[y]our request for a change in your warranty parts reimbursement allowance to 98.84% is not supported by the repair orders submitted by your dealership and reviewed by GM." Notably, GM did not contend that the

information and documentation Lupient submitted was not sufficient, only that it did not support Lupient's requested reimbursement rate.

21.     Lupient responded to GM's denial (and proposed alternative rate) through a letter dated June 4, 2013. Lupient's response is attached as Exhibit D. Lupient specified several reasons why GM's analysis was incorrect and unlawful. For example, Lupient made clear that GM's insistence that Lupient include service performed on non-Chevrolet vehicles in the determination of its retail rate was not warranty-like and improper, because those services are not required since the only required services under the dealer agreement are of Chevrolet vehicles. Likewise, Lupient took issue with GM's contention that non-GM parts must be included in the determination of Lupient's retail rate. Obviously, non-GM parts are not "like services" as they are not purchased by Lupient for warranty service or required by GM in warranty service. Furthermore, Lupient pointed out that several body shop repairs should be excluded as repairing damage caused by a driver or someone else is not a warranty-like service. Lupient also made clear that GM proposed to include repairs that were clearly specified as "maintenance", and not covered by warranty, while excluding repair orders that covered warranty-like services (such as air filters) that have been accepted by GM in other Minnesota dealer submissions.[4]

22.     GM responded to Lupient's letter through a letter dated July 2, 2013. GM's response is attached as Exhibit E. GM's response continued to refuse to recede from the

---

[4] In addition to these reasons, GM also insisted that routine maintenance items such as tires be included in the calculation despite that routine maintenance of tires is not covered under GM's warranty and thus is not a warranty "like service". And, GM proposed to include 67 repair orders outside of the range submitted by Lupient in its request.

substance of most of its positions. Perhaps most striking, GM contended that "Minnesota statute does not require that GM only consider the mark up on parts used in warranty repairs", in an effort to defend its insistence that Lupient include non-GM parts in the retail calculation. GM also contended that the body shop repairs did not clearly indicate damage and thus they are presumed to be warranty-like. This defies comprehension as a vehicle is sent to the body shop precisely because it has damage and the body shop does not perform regular nonwarranty service. GM then proposed a "retail rate" of 79%, which is even lower than the 80% initially proposed. GM's actions in requiring Lupient to include non-GM parts, repairs made on non-Chevrolet vehicles, and non-warranty-like parts clearly violate the Section 80E.04.

<u>Lupient's Request for Retail Labor Reimbursement Pursuant to Minnesota Law and GM's Unlawful Denial</u>

23. In addition to its request for retail parts reimbursement, Lupient also requested retail labor reimbursement pursuant to Section 80E.04, which provides that "[t]he hourly labor rate paid to … a dealer for warranty services shall not be less than the rate charged by the dealer for like service to nonwarranty customers for nonwarranty service and repairs." Much like with Lupient's retail parts request, GM unlawfully denied Lupient's labor request and sought to include numerous repairs that were not warranty-like.

24. Lupient requested retail labor reimbursement at $127.86 through a letter dated April 29, 2013. Lupient's Response is attached as Exhibit F. In conjunction with its request, Lupient also submitted to GM the underlying information/documentation

utilized in the calculation of its retail rate. These documents include the reports, repair orders relied upon, and analytical documentation, all of which supports Lupient's requested retail reimbursement rate. Lupient's request was based upon the clear requirements of Section 80E.04 and included only repairs performed on Chevrolet vehicles (those Lupient is required to service).

25.  GM responded to Lupient's request through a letter dated June 12, 2013, and rejected Lupient's request of warranty labor reimbursement at $127.86. GM's Response is attached as Exhibit G. Instead, GM proposed an alternative rate of $113.35. GM stated that this proposal was based upon GM's review of copies of the repair orders submitted. Notably, GM did not contend that the information and documentation Lupient submitted was not sufficient, only that it did not support Lupient's requested reimbursement rate.

26.  Lupient responded to GM's denial (and proposed alternative rate) through a letter dated June 27, 2013. Lupient's Response is attached as Exhibit H. Lupient specified several reasons why GM's analysis was incorrect and unlawful. For example, Lupient noted that 37 repair orders that GM sought to include in the retail determination were for work on non-Chevrolet vehicles. Those cannot be "like services" as required under the statute because Lupient is not required under its dealer agreement to provide warranty service on non-Chevrolet vehicles. Likewise, Lupient noted that GM sought to include repairs that were not warranty-like, such as tires that were replaced due to ordinary wear and tear, body shop repairs, and repairs for routine maintenance. Lupient then requested its initial rate of $127.86.

27. GM did not respond to Lupient's request, and continued its unlawful behavior.

28. GM's actions in denying Lupient's parts and labor retail reimbursement requests are unlawful for two simple reasons. First, Lupient's retail rate is to be determined based upon "like service" to the "warranty service and parts required of the dealer by the manufacturer." The statute's focus is on what is required by the manufacturer and then the retail rate must be set based on "like service" to nonwarranty customers. Clearly, warranty service on non-Chevrolet vehicles is not required under Lupient's franchise agreement for the reasons set forth above. See Exhibit A 5.2.1. and 7.1.2. Additionally, the warranty reimbursement is "for parts purchased by a dealer for warranty services", which under the explicit terms of the franchise agreement can only be GM parts. See Exhibit A 7.2.1. Therefore, the nonwarranty service used to determine the dealer's retail rate (i.e. "like service") must mirror the warranty service. Notwithstanding the clear statutory command, GM denied Lupient's request and insisted that Lupient include service on vehicles it is not required to service, parts that were not purchased from GM, and other service that is not "warranty-like", such as routine maintenance not covered under any warranty. GM's actions are patently unlawful.

29. Second, upon information and belief, GM has treated Lupient in a discriminatory manner by insisting that Lupient include non-GM parts as well as vehicles Lupient is not required to service. Indeed, Lupient understands that GM has approved numerous other Minnesota GM dealers' respective retail rates (and correspondingly their warranty reimbursement) pursuant to the calculation method under which Lupient

submitted its requests (i.e. only warranty-like service of Chevrolet vehicles using GM parts). Rather than following the statute and its own prior course of dealing with other Minnesota GM dealers, GM has altered its warranty reimbursement requirements and thereby discriminated against Lupient. GM's actions are clearly discriminatory in that it treats Lupient differently than it has other GM dealers in the state for no apparent reason other than to unlawfully reimburse Lupient at an amount lower than Lupient's retail rate for parts and labor.

30. GM's refusal to follow the Minnesota retail reimbursement statute and treat Lupient like other Minnesota dealers led to correspondence between Lupient and GM counsel. Lupient's counsel detailed why GM's actions were unlawful and reserved Lupient's rights to address these issues. See Correspondence attached as Exhibit I. However, GM refused to alter its position.

31. GM's actions have damaged Lupient, and continue to damage Lupient as GM's actions are ongoing. Lupient estimates that the damage incurred as a result of GM's actions is approximately $215,055 annually.

### Count I (Violation of Minn. Stat. § 80E.04)

32. Lupient realleges and incorporates paragraphs 1-31 as set forth fully herein.

33. Minn. Stat. § 80E.04 requires that GM reimburse Lupient for warranty service and parts required by GM at a rate no less than what Lupient charges to its retail customers for warranty-like service.

34. Lupient requested that GM reimburse it for parts required to be used in warranty service at its retail rate of 98.84% and provided GM with the underlying

10570295v1

documentary support for its retail calculation. GM has repeatedly refused to reimburse Lupient at its retail rate, and instead, sought to include parts that were not used in warranty-like service as well as parts that are not even GM parts in the determination of Lupient's retail rate while also excluding parts that actually were used in warranty-like service.

35. Lupient also requested that GM reimburse it for labor at its retail rate of $127.86. As with Lupient's parts request, GM denied Lupient's retail request and insisted that Lupient include service on vehicles it is not required to service under warranty as well as service that was not warranty-like such as routine maintenance, tires replaced due to wear and tear, and body shop repairs.

36. GM's actions are a clear and purposeful violation of Section 80E.04. Pursuant to its franchise agreement, Lupient is not required to provide warranty service to vehicles other than Chevrolet. See Exhibit A Sections 5.2.1 and 7.1.2. Likewise, Lupient is required to use GM parts in its warranty service, and must notify nonwarranty customers if it uses a non-GM part in the service. See Exhibit A 5.1.1 and 7.2.1.-7.2.2.

37. Nonetheless, GM insists that the calculation of Lupient's retail rate (and warranty-like service) include vehicles other than Lupient is authorized to sell (and required to service) as well as non-GM parts. GM's insistence is a direct contradiction to the statutory requirements. There is simply no way that "warranty-like service" (i.e. that service which Lupient is required to perform under its dealer agreement and with parts it purchased from GM) could include vehicles that Lupient is not required to service and parts it does not purchase from GM.

13

38.  GM's actions are not accidental as Lupient has made this clear from the beginning, yet, GM has continued its unlawful behavior, which not surprisingly has the effect of drastically decreasing Lupient's retail rates and the amount of money GM must reimburse Lupient.

39.  Lupient has been, and continues to be, damaged by GM's actions.

40.  Lupient has the right to bring this claim pursuant to Section 80E.17, which allows Lupient to recover damages as well as its attorney's fees. Lupient requests a judgment against GM in the amount of its damages as well as its attorney's fees expended in pursuit of its claim.

### Count II (Violation of Minn. Stat. § 80E.13(h))

41.  Lupient realleges and incorporates paragraphs 1-40 as if set forth fully herein.

42.  Section 80E.13(h) makes it an unlawful and an unfair practice for GM to "discriminate among its new motor vehicle dealers with respect to warranty reimbursement."

43.  GM has insisted that Lupient include *inter alia* non-GM parts as well as parts/repairs used in service of vehicles Lupient is not authorized to sell in order to determine Lupient's retail rate. This unlawful behavior has resulted in a dramatic decrease of Lupient's parts and labor reimbursement rate.

44.  Upon information and belief, GM has not required other Minnesota GM dealers to establish its retail rate in this method, which is the basis for the other Minnesota GM dealers' warranty reimbursement payments.

10570295v1

45. GM's actions discriminate against Lupient with respect to warranty reimbursement, because GM has reimbursed other Minnesota GM dealers based on a different set of requirements than Lupient, which has negatively impacted Lupient by reducing its reimbursement rate. Simply put, GM has applied a different standard to Lupient for warranty reimbursement than other Minnesota GM dealers.

46. Lupient has been damaged by GM's actions, and continues to be harmed each month that GM's actions continue.

47. Lupient has the right to bring this claim pursuant to Section 80E.17, which allows Lupient to recover damages as well as its attorney's fees. Lupient requests a judgment against GM in the amount of its damages as well as its attorney's fees expended in pursuit of its claim.

## Count III (Declaratory Judgment of Retail Rate)

48. Lupient realleges and incorporates paragraphs 1-47 as if set forth fully herein.

49. An actual controversy exists between Lupient and GM as to the required warranty reimbursement rate for warranty work pursuant to Minnesota Statute Section 80E.04, including labor and parts, conducted by Lupient and required by GM.

50. GM has failed to reimburse Lupient at the rate required by Minnesota law (*i.e.*, Section 80E.04) for labor and parts provided by Lupient and required by GM in Lupient's provision of warranty service.

51. Lupient has been damaged by GM's actions, and continues to be harmed each month that GM's actions continue.

10570295v1

52. There exists a question and an actual controversy between GM and Lupient as to Lupient's retail reimbursement rate for labor and parts used in warranty service, which is required by Section 80E.04.

53. Lupient seeks a declaratory judgment pursuant to Title 28, United States Code, § 2201, for the purpose of determining this question of actual controversy between the parties.

54. The damages that have been and will be caused to Lupient as a result of GM's actions are greater than $75,000.00.

WHEREFORE, Lupient demands a jury trial on all issues so triable and entry of a judgment against GM:

(i) finding that GM has violated Minnesota Statute Section 80E.04;

(ii) finding that GM has violated Minnesota Statute Section 80E.13(h);

(iii) declaring the warranty reimbursement rate to be used by GM when compensating Lupient for warranty service and parts; and

(iv) awarding Lupient its damages as well as attorney's fees and costs.

Dated: February 4, 2014

/s/ Bryant D. Tchida
Bryant D. Tchida (#0314298)
STINSON LEONARD STREET LLP
150 South Fifth Street, Suite 2300
Minneapolis, Minnesota 55402
Telephone: (612) 335-1500
Facsimile: (612) 335-1657

**ATTORNEYS FOR LUPIENT CHEVROLET, INC. d/b/a Lupient Chevrolet**

10570295v1